# EXHIBIT A

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 2 of 25 PageID #: 12

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF QUEENS

| | |
|---|---|
| NERYE AMINOV, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Index No. |
| | **SUMMONS** |
| v. | |
| DRAFTKINGS, INC., | |
| Defendant. | |

Queens County is designated as the place of trial. The basis of venue is that Plaintiff resides in this County.

**TO THE ABOVE-NAMED DEFENDANT:**

**PLEASE TAKE NOTICE THAT YOU ARE SUMMONED** to answer the complaint of the Plaintiff herein, and to serve a copy of your answer on the Plaintiff at the address indicated below within 20 days of service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

**YOU ARE HEREBY NOTIFIED THAT** should you fail to answer, a judgement will be entered against you by default for the relief demanded herein.

Dated:  September 30, 2024

Respectfully Submitted,

*/s/ Andrew J. Shamis*
Andrew J. Shamis
New York Bar No. 5195185
Leanna A. Loginov
New York Bar No. 5894753
Edwin E. Elliott*
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 3 of 25 PageID #: 13

Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jeffrey D. Kaliel*
Sophia Goren Gold*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

Adam A. Schwartzbaum*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
adam@edelsberglaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed Classes*

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 4 of 25 PageID #: 14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

NERYE AMINOV, individually, and on behalf of
all others similarly situated,

        Plaintiff,

     v.

DRAFTKINGS, INC.,

        Defendant.

Index No.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Nerye Aminov, individually and on behalf of all others similarly situated, hereby brings this class action complaint against Defendant DraftKings, Inc., ("DraftKings") and alleges as follows:

### INTRODUCTION

1.    As many states have legalized online sports betting in recent years it has quickly become a multi-billion-dollar industry. In a crowded online betting marketplace, the stakes are high for operators to corner the market on new sports betting customers. DraftKings has become a sports betting industry leader by using unfair and deceptive marketing to lure new gamblers. This class action lawsuit seeks to stop DraftKings' fraudulent practices and to restitute consumers the millions of dollars they lost because of DraftKings' scam.

2.    DraftKings' encouraged people to sign up for its sports betting platform with splashy television and print advertisements, extensive internet and social media advertising, and in-arena marketing, all promising to provide new users would "GET A $1,000 DEPOSIT BONUS." Plaintiff reasonably understood the phrase "Deposit Bonus" to mean he would receive

$1,000 automatically deposited to his DraftKings account when, as a first-time user, he opened a new DraftKings account and made an initial deposit.

3.      But the "$1,000 DEPOSIT BONUS" promise was a lie, and Plaintiff never received the promised bonus. That is because DraftKings' actual policy and practice was to condition the payment of any bonus on a ludicrously complex set of requirements—and even where those requirements were met, to pay bonuses only in small increments over time.

4.      As a result, and upon information and belief, DraftKings almost never paid the $1,000 Deposit Bonus it promised to *any* New York users. The $1,000 Deposit Bonus is structured so that it is nearly impossible to obtain and any new user is almost certain to lose money chasing it.

5.      DraftKings' advertising of the $1,000 Deposit Bonus is also unfair and deceptive because an eligible consumer who, by definition, is a new participant in New York sports betting, like Plaintiff, would be unlikely to understand the costs and risks involved in qualifying for the $1,000 Deposit Bonus. Moreover, DraftKings concealed the true risks and costs of its platform from consumers like Plaintiff by using advertisements that prominently featured materially deceptive representations while omitting any warnings that it is almost impossible for any individual to obtain the $1,000 Deposit Bonus.

6.      The marketing representations and omissions made by DraftKings and upon which Plaintiff relied were false and misleading. If such marketing had fairly informed of the virtually impossible odds of obtaining the $1,000 Deposit Bonus, Plaintiff would not have signed up for DraftKings.

7.      Consumers like Plaintiff were fraudulently induced to open accounts, make initial deposits, and place bets with DraftKings because of its misrepresentations and omissions.

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 6 of 25 PageID #:
16

Consequently, the $1,000 Deposit Bonus marketing representations and omissions violate state consumer protection law and violate the duty of care DraftKings owes to its customers.

8.      Because of signing up for and using DraftKings Sportsbook, Plaintiff and Class members suffered monetary damages. Plaintiff brings this class action on behalf of himself and the putative class members that have been injured by signing up for and using DraftKings based on the $1,000 Deposit Bonus promise. Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the public to prevent DraftKings from continuing to engage in their illegal practices.

**PARTIES**

9.      Plaintiff Nerye Aminov, at all relevant times, was a citizen and resident of Queens, New York.

10.     Defendant DraftKings, Inc., is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts. Defendant is licensed under the New York Gaming Commission and has operated mobile betting platforms in New York since 2022.

**JURISDICTION AND VENUE**

11.     This Court has original jurisdiction over this matter because Plaintiff is domiciled here.

12.     Defendant is subject to the jurisdiction of this Court because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this County.

13.     Venue is proper in this County pursuant to NY CPLR § 503 (2012); a substantial part of the acts and omissions giving rise to this lawsuit occurred in this County.

## FACTUAL ALLEGATIONS

### A.    Online Sports Betting

14.    In 2018, the U.S. Supreme Court ruled that states other than Nevada were free to establish their own sports gambling laws. Thirty-eight states (plus Washington, D.C. and Puerto Rico) now allow legal online sports betting, and the legalization of such betting has led to a rush of aggressive marketing by operators hoping to lure new customers.

15.    In January 2022, New York legalized online sports betting and sportsbooks, including DraftKings, have been operating there ever since.

16.    As online sports betting companies rushed to capture a share of these new betting markets, many chose marketing messages that lured new users with the promise of cash bonuses. For example, Barstool Sports promised new users a $1,000 "bonus" for making a first bet.

17.     While tantalizing offers have been effective at persuading Plaintiff and other Americans to open and use betting accounts, new users later learn a startling reality: even so-called deposit "bonuses" can result in the customer losing every dollar of their initial deposit.

18.    Not only do false promises of sign-up bonus bets lure consumers into opening and using betting accounts, but the false promises also incentivize and normalize betting larger amounts than consumers would otherwise wager. Novices like Plaintiff are seduced into gambling over their heads, endangering their financial well-being and that of their families, having been lured in by DraftKings' $1,000 Deposit Bonus.

19.    According to the Washington Post, as part of their effort to hook tens of millions of Americans on gambling, sportsbooks like DraftKings have spent billions of dollars on splashy marketing promises and promotions. For example, in the 2021–2022 NFL season, online sportsbooks including DraftKings flooded NFL broadcasts with commercials promising sign-up

promotions. *See* https://www.washingtonpost.com/sports/2022/09/27/caesars-fanduel-draftkings-commercials/. The glut of sportsbook commercials has continued into the present.

20.    The calculus for online sportsbooks is simple: incessant broadcast ads and enticing sign-up deals make sense, since on average a new user will lose several thousand dollars to the sports book over the lifetime of each customer they can convince to sign up.

21.    Glitzy, eye-popping promotions like large sign-up bonuses are a sure-fire method of luring new bettors choosing among myriad online sportsbooks—all of whom generally offer the same technology and the same betting options.

22.    Several years ago, many online sportsbooks truly did provide no-strings-attached free cash to lure new users, for example by providing straightforward deposit matches when new users signed up. After an initial wave of generous deposit bonuses contributed to steep losses for many operators, DraftKings and others stopped offering free cash in most states.

23.    In an online gambling marketplace saturated by sign-up promotions advertising a large dollar figure—some of which are truly no-strings-attached cash matches and some of which, like DraftKings, are not—consumer confusion reigns. Operators like DraftKings exploit that confusion by promising large sign-up bonuses but instead actually providing complicated deals that require hefty investment of personal funds and onerous requirements to actually recoup their money.

**B.    DraftKings' False and Misleading Marketing and Deceptive Sign-up Process Lures Reasonable Consumers to Sign Up for and Use DraftKings.**

24.    DraftKings introduced its online sportsbook to the American public with a massive advertising blitz as early as 2018 in some states.

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 9 of 25 PageID #: 19

25.     DraftKings omnipresent national TV and print and internet ads—featuring actors Kevin Hart along with basketball legends Michael Jordan and LeBron James—helped the sportsbook increase its market share dramatically as states began legalizing online sports betting.

26.     DraftKings' ads targeted new users and directed consumers to the DraftKings website and mobile app promising a $1,000 Deposit Bonus upon sign-up and other similar representations.

27.     DraftKings' marketing strategy was part of an intentional initiative to capitalize on the addictive nature of gambling, and the established susceptibility of online sports betters.

28.     In fact, DraftKings' preferred audience is new users and novice gamblers—those who are most likely to lose money. Its CEO admitted: "This is an entertainment activity. People who are doing this for profit are not the ones we want." In fact, sportsbooks, including DraftKings, will often limit or even outright ban "sharps," gamblers who are sophisticated and make too many winning bets. *See* www.bettingusa.com/draftkings-comments-controversy/. The not-so-subtle implication: DraftKings is only interested in casual gamblers who it can dupe into losing hundreds or thousands of dollars for its profit.

29.     In New York, DraftKings' massive advertising campaign swiftly solidified it as an early leader in the online sports betting market. In its first three months operating in the state, DraftKings handled over $1.1 billion worth of bets and generated nearly $40 million in revenue.[1]

30.     In less than 18 months, New York online sportsbooks has overtaken both New Jersey and Nevada as the country's largest and most lucrative market since the start of 2022 and it continues to dominate as the top state with highest sports betting revenue.

---

[1] *See* https://www.gaming.ny.gov/pdf/Mobile/Monthly%20Mobile%20Sports%20Wagering%20Report%20DraftKings.pdf

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 10 of 25 PageID #: 20

31.     In 2022 and for the majority of 2023, DraftKings advertised the "$1,000 Deposit Bonus" as a reward for signing up for its sportsbook platform in these (or materially similar) terms:



32.     Plaintiff recalls viewing this and similar advertisements online on DraftKings website and mobile app prior to signing up for DraftKings in or around January 2022.

33.     But a new customer of DraftKings was never going to receive "a $1,000 Deposit Bonus" in exchange for signing up for the sportsbook platform, as the advertisements asserted. For a new customer to obtain the $1,000 Deposit Bonus, they would in fact have to satisfy three significant requirements. Specifically, to qualify for the $1,000 Deposit Bonus, the new user:

i)   Must immediately deposit at least $5,000 in cash with DraftKings; and

ii)  Must wager at least $25,000 with DraftKings within 90 days; and

iii) do so on daily fantasy contests, sportsbook bets with -300 odds or longer, and/or casino products,

34.     Because of the misleading nature of the advertisements and their material omissions, new DraftKings users like Plaintiff did not understand, and could not reasonably have been expected to understand, the true risks and costs associated with trying to obtain the $1,000 Deposit Bonus.

35.     To be truthful and to correspond with DraftKings' actual policy, DraftKings' advertisements would have had to say "GET A DEPOSIT BONUS OF UP TO 20% OF YOUR FIRST DEPOSIT, BUT ONLY IF YOU BET 25 TIMES MORE THAN THE DEPOSIT BONUS WE GIVE YOU" or "GET A DEPOSIT BONUS OF UP TO 20% OF YOUR FIRST DEPOSIT,

BUT WE WILL ONLY PAY THAT BONUS AS $1 FOR EVERY $25 YOU BET." Of course, the DraftKings ads never said that, because such a truthful offer would be wildly unappealing to Plaintiff and other reasonable New York consumers.

36.     DraftKings' advertisements did not fairly inform new users that the Deposit Bonus is calculated as 20% of up to $5,000 of the new user's *first* deposit. DraftKings failed to fairly disclose that consumer needed to immediately deposit $5,000 and then subsequently bet at least $25,000 to qualify for the $1,000 Deposit Bonus.

37.     New DraftKings users like Plaintiff did not understand, and could not reasonably have been expected to understand, that to place bets for at least $25,000 over 90 days to qualify for the Bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months. Were players only to gamble, for example, every third day over that period, their average daily wager would have had to be $828 to qualify for the Bonus.

38.     DraftKings knew or should have known that the $1,000 Deposit Bonus promotion was deceptive to its target customers.

39.     Defendant was required to accurately represent the unique features of the DraftKings Sportsbook service in its marketing but failed to do so.

40.     During the DraftKings sign-up process, DraftKings' mobile app and online website feature numerous invitations and advertisements to sign up for the DraftKings Sportsbook, making the same or materially similar promises about the $1,000 Deposit Bonus. Similarly, in its marketing about DraftKings and during the DraftKings signup process within its mobile app and website, Defendant makes repeated promises that DraftKings offers a $1,000 Deposit Bonus.

41.     DraftKings misrepresents the true nature, benefits, and risks of signing up for and using the DraftKings betting platform. These representations—which all users, including Plaintiff,

view in marketing and during the sign-up process—are false and contain material omissions. Neither DraftKings' marketing nor sign-up process informed consumers like Plaintiff of the true financial risks of using the DraftKings service. Plaintiff would not have signed up for or used DraftKings if he had been adequately informed of the risks associated with the $1,000 Deposit Bonus promotion.

42.     As a result of DraftKings' deceptive and unfair conduct, users like Plaintiff signed up for and used the DraftKings Sportsbook service without the benefit of accurate information regarding that service, and later ended up with large, unreimbursed losses.  Such users never would have signed up for DraftKings if they had known the extreme risks of using the service for an initial sign-up bonus.

### C.     Because DraftKings' Promos Target New Sports Bettors, It Is Predatory and Unfair Business Practice

43.     DraftKings knew, or should have known, that its advertisement and promotion was deceptive to its target customers, who were customers new to sports betting and who were extremely unlikely to understand the details of the promotion, even if it were fairly and prominently disclosed in readable English on the company's platform or in a font size that a reasonable consumer could be expected to actually read.

44.     DraftKings knowingly designed its promotion to unfairly maximize the number of consumers that would sign up for its sports gambling platform, the number of bets that would be placed through the platform, and the amount of money that would be placed on bets through its platforms. This is a particularly unfair and deceptive business practice because of the addictive nature of the Defendant's gambling product—another fact of which DraftKings is well aware.

45.     Gambling products are not typical consumer products. They are addictive. Both the

Fifth Edition (current) of the American Psychiatric Association's Diagnostic and Statistical

Manual of Mental Disorders (DSM-5) and the World Health Organization treat addiction to

gambling in the same diagnostic category as addiction to heroin, cocaine, and tobacco. Marketers

of a known addictive product should take special precautions to minimize addiction risk, not

require $25,000 of gambling to qualify for a promotional offer to new customers who are likely to

be gambling-naïve. DraftKings' promotion is an unfair and deceptive business practice for this

reason as well.

46.     The National Council for Problem Gambling ("NCPG") has raised concerns since

2018 about the susceptibility of online sports bettors. Among other things, its research has

established that the rate of gambling problems among sports bettors, and particularly online sports

bettors, are over twice those of gamblers in general.  *See* https://www.ncpgambling.org/wp-

content/uploads/2020/01/Sportsgambling_NCPGLitRvwExecSummary.pdf.

47.     In response to these and other risks, the NCPG established the Safer Sports Betting

Initiative to specifically help reduce the risk of gambling problems created by aggressive

advertising campaigns and other risks.

48.     Since 2012, the NCPG has also promulgated its Internet Responsible Gaming

Standards. In the 2021 update to these standards, the NCPG included the following standard:

"Advertising is not misleading about outcomes of gambling and does not misrepresent odds of

winning/losing." *See* https://158bvz3v7mohkq9oid5904e0-wpengine.netdna-ssl.com/wpcontent/

uploads/2022/01/NCPG-IRGS-May-2021.pdf.

49.     In New York, Attorney General Letitia James warned of "deceptive" online sports

betting companies ahead of the 2022 Super Bowl. *See* https://ag.ny.gov/press-

Case 1:24-cv-08472-MKB-LKE   Document 1-2   Filed 12/11/24   Page 14 of 25 PageID #: 24

release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-sports.

The Attorney General's office stated: "Since online sports gambling became legal in New York last month, New Yorkers have been bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness." Attorney General James said,

> I urge all New Yorkers watching the Super Bowl and betting online for the first time to be careful – don't let scammers game your gamble. Before placing a bet, do your research into the platform, read the fine print of the offer, and follow our other tips to avoid any red flags and keep the odds in your favor. Online sports betting companies that fumble their advertising to mislead New Yorkers can expect to hear from my office.

50.     While other operators have cleaned up their acts in recent years, DraftKings has not.

### D.    Plaintiff Aminov's Experience

51.     Plaintiff Aminov signed up for DraftKings and made an initial deposit of $500 on January 27, 2022. He did so based on DraftKings' promise that he would receive a $1,000 Deposit Bonus. Plaintiff did not understand and was not fairly informed that to receive the $1,000 Deposit Bonus he would be required to deposit and wager large sums of money in a manner designed by Defendant to induce repeated exposure to a known addictive product.

52.     Defendant credited him a Deposit Bonus of only up to $100.

53.     Plaintiff would not have signed up for a DraftKings account and made an initial deposit had he known the truth about the $1,000 Deposit Bonus.

54.     Plaintiff seeks the return of his initial deposit in full or, in the alternative, the full $1,000 Deposit Bonus he was promised. Plaintiff also seeks statutory damages pursuant to GBL Section 349.

## CLASS ALLEGATIONS

55.     Plaintiff brings this action individually and as representatives of all those similarly situated, pursuant to NY CPLR § 901 (2015), *et seq*. and other applicable law, on behalf of the below-defined Classes:

**Nationwide Class:**

All persons who opened an account and deposited funds with DraftKings' sports betting platform in response to the "$1,000 Deposit Bonus" promotion or similar promotion and placed monetary bets through DraftKings' sports betting platform and were damaged thereby.

**New York Subclass:**

All New York residents who opened an account and deposited funds with DraftKings' sports betting platform in response to the "$1,000 Deposit Bonus" promotion or similar promotion and placed monetary bets through DraftKings' sports betting platform and were damaged thereby.

56.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staffs.

57.     This case is appropriate for class treatment because Plaintiff can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

58.     **Numerosity:** The members of the Classes are so numerous that joinder of all members would be unfeasible and impracticable. The precise membership of the Classes are unknown to Plaintiff at this time; however, it is estimated that the Classes number is greater than one hundred individuals. The identity of such membership is readily ascertainable via inspection of Defendant's books and records or other approved methods. Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

59.     **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiff and all other similarly situated persons, which predominate over questions affecting only individual Class members, including, without limitation:

    a)     Whether DraftKings misrepresented in its advertisements the $1,000 Deposit Bonus it was offering to the Plaintiff and the members of the Class;

    b)     Whether DraftKings intentionally designed its advertisements for the $1,000 Deposit Bonus offer in such a way as to mislead the Plaintiff and other class members in order to induce them to sign up and wager;

    c)     Whether DraftKings violated N.Y. Gen. Bus. Law §§ 349 & 350 and the common law through its unfair and deceptive illegal conduct;

    d)     Whether DraftKings was unjustly enriched at the expense of the Plaintiff and the Class members; and

    e)     The nature and extent of any additional relief which the Plaintiff and the Class members are entitled to recover under N.Y. Gen. Bus. Law §§ 349 & 350 or the common law.

60.     **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

61.     **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were similarly injured

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 17 of 25 PageID #: 27

through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, were deprived of monies that rightfully belonged to them. Further, there are no defenses available to Defendant that are unique to Plaintiff.

62.    **Adequacy of Representation:** Plaintiff is an adequate class representatives because he is fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because their interests do not conflict with the interests of the other Class members they seek to represent. Moreover, Plaintiff's attorneys are ready, willing, and able to fully and adequately represent Plaintiff and the members of the Class. Plaintiff's attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

63.    **Superiority:** The nature of this action and the claims available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of

Case 1:24-cv-08472-MKB-LKE Document 1-2 Filed 12/11/24 Page 18 of 25 PageID #: 28

the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

## FIRST CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. Law §§ 349 & 350
### (Asserted on Behalf of the New York Subclass)

64. Plaintiff repeats and realleges the allegations in paragraphs 1 through 63 as if fully set forth herein.

65. Plaintiff brings this claim against DraftKings under New York General Business Law ("GBL") §§ 349 and 350 on behalf of himself and the New York Subclass.

66. N.Y. Gen. Bus. Law § 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

67. DraftKings' actions regarding its online sportsbook platform and signup promotions, as described herein, are deceptive acts or practices in the conduct of business, trade or commerce of sports betting.

68. DraftKings' conduct was misleading, deceptive, unlawful, fraudulent, and unfair in that Defendant materially misrepresented the nature of their promotions.

69. DraftKings caused to be disseminated through New York state and elsewhere, through advertising, marketing, and other publications, statements that were untrue and misleading, and which it knew were untrue and misleading.

70. DraftKings' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to DraftKings' material misrepresentations.

71. Additionally, DraftKings' conduct was unlawful. New York law requires that all

gambling advertisements "comply with Racing, Pari-Mutuel Wagering and Breeding Law [PML] section 1363 and with advertising guidelines issued by the National Council on Problem Gambling." *See* 9 CRR-NY 5325.6.

72. Plaintiff and the New York Subclass have been injured by DraftKings' deceptive acts or practices described herein.

73. Plaintiff and the New York Subclass have no adequate remedy at law.

74. DraftKings' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the New York Subclass and will continue to both damage Plaintiff and the New York Subclass and deceive the public unless enjoined by this Court.

75. Any person who has been injured by reason of any violation of N.Y. GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or $50, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to $1,000 per violation, if the court finds that a defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

76. Defendant intentionally and knowingly engaged in these deceptive and unlawful practices. Defendant intentionally mislead Plaintiff and other New York Subclass members into signing up for its memberships based on these misrepresentations and omissions.

77. Had Plaintiff known the true nature of DraftKings' signup Bonus, Plaintiff would have never opened an account and deposited money with DraftKings.

78. Plaintiff and the New York Class have been injured by Defendant's violations of the GBL.

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 20 of 25 PageID #: 30

79.     Pursuant to N.Y. Gen. Bus. Law §350(e) Plaintiff and the New York Subclass seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to N.Y. GBL § 350(a1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of DraftKings' unlawful conduct, interest, and attorney's fees and costs.

### SECOND CAUSE OF ACTION
**Intentional Misrepresentation**
**(Asserted on Behalf of the Classes)**

80.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 63 as if fully set forth herein.

81.     Plaintiff brings this claim against Defendant under the common law on behalf of himself and the Classes.

82.     Defendant advertised its sign-up offers to indicate that bets placed on DraftKings service would be risk free. Despite this representation, the promotions in fact carry a risk of loss. Therefore, Defendant has misrepresented the promotional offers.

83.     DraftKings' misrepresentations regarding these promotional offers are material to the reasonable consumer because they relate to the characteristics, nature, and value of the services provided, as well as of the advertised offer. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making the decision to place bets on Defendant's platform in reliance on the same.

84.     At all relevant times when Defendant made such representations, Defendant knew that the representations were misleading, or acted recklessly in making the representations, without regard for their truth or falsity.

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 21 of 25 PageID #: 31

85.    Defendant intended for Plaintiff and Class members to rely on these representations.

86.    Plaintiff and Class members reasonably and justifiably relied on Defendant's intentional misrepresentations when placing bets via its promotions. Among other things, this reliance was justified because consumers were entitled to understand that these advertisements would comply with applicable law.

87.    Had they known the truth, Plaintiff and Class members would not have signed up with Defendant's platform in the first place.

88.    Therefore, as a direct and proximate results of Defendant's intentional misrepresentations, Plaintiff and Class members have suffered economic losses and other general and specific damages, including the amounts paid to Defendant for placing bets in the first place, and losses associated with any subsequent bets placed in an effort recover their original funds.

### THIRD CAUSE OF ACTION
### Fraudulent Inducement
### (Asserted on Behalf of the Classes)

89.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 63 as if fully set forth herein.

90.    Plaintiff brings this claim against Defendant individually and on behalf of all Class members.

91.    Defendant misrepresented multiple material facts about its promotional offers, as described throughout this Complaint.

92.    Plaintiff and Class members relied on Defendant's representations and omissions in creating accounts on DraftKings in reliance on the promotion.

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 22 of 25 PageID #: 32

93.    Plaintiff and Class members were justified in so relying, because they were entitled to believe that Defendant would not violate the law by failing to make requisite disclosures to its consumers, or to misrepresent the nature of its advertised offers.

94.    At the time Defendant made these misrepresentations to consumers, it knew them to be false.

95.    At the time Defendant made these misrepresentations to consumers, it had no present intent to fulfil the terms of the promotional offer as advertised to consumers.

96.    As a result of Defendant's misrepresentations, Plaintiff and Class members sustained monetary damages amounting to the total losses each sustained in reliance on the sign-up bonus.

97.    Absent these misrepresentations, Plaintiff and the Class members would not have created accounts or placed bets on DraftKings' platform.

98.    Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiff and Class members have suffered economic losses and other general and specific damages, including, but not limited to, the amounts paid to Defendant for placing bets in the first place, as well as losses associated with any subsequent bets placed in an effort to recover their original funds.

**FOURTH CAUSE OF ACTION**
**Quasi Contract/Unjust Enrichment/Restitution**
**(Asserted on Behalf of the Classes)**

99.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 63 as if fully set forth herein.

100.    Plaintiff brings this claim against Defendant individually and on behalf of all Class members.

101. As alleged herein, Defendant has intentionally and/or recklessly made misleading misrepresentations to Plaintiff and Class members to induce them to create accounts and place bets on its platform.

102. Plaintiff and the Class members have reasonably relied on these misleading representations and have not received the benefits promised by Defendant.

103. Plaintiff and the Class members therefore have been induced by Defendant's misleading and deceptive representations about the promotional offers and paid more money to Defendant to place bets than they otherwise would and/or should have paid.

104. Plaintiff and the Class members have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiff and the Class members.

105. The money Defendant received was obtained under circumstances that were at the expense of Plaintiff and the members of the Class members. In other words, Plaintiff and the Class members did not receive the full value of the benefit conferred upon Defendant.

106. Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon it without paying Plaintiff and the Class members back for the difference of the full value of the benefits compared to the value actually received.

107. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and members of the New York Subclass are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

Case 1:24-cv-08472-MKB-LKE    Document 1-2    Filed 12/11/24    Page 24 of 25 PageID #: 34

    A.    Certifying the proposed Classes, appointing Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

    B.    Declaring that Defendant's policies and practices as described herein constitute a violation of the consumer protection statutes invoked herein;

    C.    Declaring the Defendant's policies and practices described herein constitution a negligent misrepresentation, an intentional misrepresentation, fraudulent inducement, and/or a breach of a quasi contract or unjust enrichment;

    D.    Enjoining Defendant from the wrongful conduct as described herein;

    E.    Awarding restitution of all monies at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

    F.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

    G.    Awarding actual and/or compensatory damages in an amount according to proof;

    H.    Punitive and exemplary damages;

    I.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

    J.    Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

    K.    Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demands trial by jury on all issues in this

Class Action Complaint that are so triable.

Dated:  September 30, 2024                    Respectfully Submitted,

*/s/ Andrew J. Shamis*
Andrew J. Shamis (Bar No. 5195185)
Leanna A. Loginov (Bar No. 5894753)
Edwin E. Elliott*
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jeffrey D. Kaliel*
Sophia Goren Gold*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

Adam A. Schwartzbaum*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
adam@edelsberglaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed Classes*