**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NERYE AMINOV, individually, and on behalf of all others similarly situated, | Case No. 1:24-cv-08472-MKB-LKE |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| DRAFTKINGS INC., | |
| Defendant. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS THAT MUST BE TAKEN AS TRUE ................................................ 3

   A.  The Nationwide Legalization of Online Sports Betting Starts a Race to Capture Market Share and Fuels Deceptive Marketing to Increase Sign Ups and Deposits. ....................... 3

   B.  DraftKings' False and Misleading Marketing and Deceptive Sign-Up Process Lures Reasonable Consumers to Sign Up for and Use DraftKings. ............................................... 5

   C.  Plaintiff's Experience with DraftKings ................................................................................ 7

ARGUMENT ...................................................................................................................... 7

   I.    STANDARD OF REVIEW ........................................................................................... 7

   II.   THE COURT SHOULD DISREGARD DEFENDANT'S DECLARATION AT THE MOTION TO DISMISS STAGE ................................................................................... 7

   III.  THE COURT SHOULD DENY THE MOTION TO DISMISS BECAUSE THE COMPLAINT ADEQUATELY STATES CLAIMS FOR RELIEF .......................... 10

   A.  Plaintiff Sufficiently Alleges He Was Misled by DraftKings' Deceptive Marketing, Despite the "Fine Print" Buried in the Promo Terms. ..................................................... 10

   B.  Plaintiff Properly Pleads a Cognizable Injury under the GBL Sections 349 and 350 ....... 16

   C.  Plaintiff Satisfies the GBL'S "Territoriality" Requirement .............................................. 18

   D.  Plaintiff States a Claim For Unjust Enrichment .............................................................. 18

CONCLUSION .................................................................................................................. 20

## INTRODUCTION

DraftKings' marketing blitz splashed ads across New York and nationwide—in TV, print, social media and online—promising new users who signed up for its sports betting platform to "GET A $1,000 DEPOSIT BONUS." In truth, the $1,000 Deposit Bonus promise was false, misleading, and intentionally designed to lure novice gamblers to DraftKings' online betting platform. DraftKings' deceptive and misleading advertisements induced individuals like Plaintiff who, by definition, were new participants in New York sports betting, to wager vast sums of money on potentially risky bets. Although the advertisements implied that new customers would receive a $1,000 cash payment when they opened a new account and made a deposit with DraftKings, DraftKings never offered cash bonuses. Instead, to receive the full $1,000 bonus, consumers had to make an initial single deposit of $5,000 and wager at least $25,000 on risky bets within a 90-day period. Consumers could not reasonably have been expected to understand that to receive their "$1,000 Bonus", they needed to satisfy additional, onerous requirements explained only in hidden Promo Terms not prominently disclosed with the advertisements.

Because of the $1,000 Bonus offer, Plaintiff signed up for and made a deposit of $500 with DraftKings, but he did not receive the $1,000 Bonus that he reasonably believed DraftKings promised him. Plaintiff would have not signed up for nor made an initial deposit had he known the truth about $1,000 Deposit Bonus. Consequently, Plaintiff and all Class members were damaged by DraftKings' deceptive and misleading representations. Based on these allegations, Plaintiff sufficiently states causes of action for violation of New York General Business Law ("GBL") §§ 349 & 350, Intentional Misrepresentation, Fraudulent Inducement, and Quasi Contract/Unjust Enrichment/Restitution; and the Complaint complies with the pleading specificity requirements of Federal Rule of Civil Procedure 9(b).

DraftKings' main defense to Plaintiff's claims is that because it separately disclosed the true nature of its Promo Terms, then its eye-popping $1,000 Deposit Bonus advertisement could not be deceiving. This defense does not defeat Plaintiff's causes of action because Plaintiff disputes that the Promo Terms were clearly and conspicuously disclosed and that he never agreed to them. Accordingly, DraftKings' argument that fine print buried within its mobile application neuters its prominent marketing representations fails, particularly at the pleadings stage. New York law does not allow a company to prominently advertise one thing, then disclaim those promises in fine print.

The Court should also reject DraftKings' effort to smuggle in the supposed fine print Promo Terms through a self-serving declaration. At the motion to dismiss stage, the Court must accept the Plaintiff's allegations as true and reject Defendant's effort to interject documents outside the pleadings, particularly when Plaintiff has had neither the benefit of discovery nor the ability to cross examine the introduction of such evidence. Moreover, even if the Court were to consider the declaration, it still fails to provide sufficient grounds to support dismissal for failure to state a claim. The declaration merely states that the Promo Terms were available at the bottom of DraftKings' website and mobile app. Importantly, however, the declaration does *not* state that the Promo Terms were affirmatively disclosed during the sign-up process for new users and does *not* state Plaintiff had to review them before depositing. Thus, the declaration does not rebut Plaintiff's well pleaded factual allegations that he was induced to sign up for DraftKings based on the unfair and deceptive advertisements about the $1,000 Deposit Bonus.

Based on the foregoing factual allegations and evidence, the Court should conclude that the existence of the fine print Promo Terms on DraftKings' website and/or mobile app provides insufficient support for DraftKings' 12(b)(6) dismissal arguments. DraftKings fails to provide uncontroverted evidence to show that the fine print it relies on ever became binding on Plaintiff—

and even if it did, DraftKings has also failed to show that its fine print overrode Plaintiff's otherwise reasonable understanding of the $1,000 Deposit Bonus promise. Furthermore, the well-pleaded factual allegations, which must be taken as true and in a light most favorable to Plaintiff, clearly state fraud-based causes of action based on DraftKings' deceptive advertisements. When and how the fine print Promo Terms were disclosed and whether they matter to Plaintiff's claims are matters for discovery.

In sum, DraftKings marketing representations are adequately alleged to be deceptive, and the claims are sufficiently specific to place Defendant on notice of the claims, in accordance with Rule 9(b). The Court should deny the Motion.

## STATEMENT OF FACTS THAT MUST BE TAKEN AS TRUE

### A. The Nationwide Legalization of Online Sports Betting Starts a Race to Capture Market Share and Fuels Deceptive Marketing to Increase Sign Ups and Deposits.

After the U.S. Supreme Court ruled that all states could establish their own sports gambling laws, thirty-eight states, including New York, legalized online sports betting, leading to a rush of aggressive marketing by sportsbooks like DraftKings to conquer this market. *See* ECF No. 1-2 ("Compl.") ¶¶ 14–15. To quickly sign up new customers, DraftKings launched a deceptive and misleading promotion to lure novice gamblers and induce them to wager risky bets. *Id.* ¶ 18. Specifically, for new customers who opened accounts and deposited cash, DraftKings disseminated misleading advertisements promising a "$1,000 DEPOSIT BONUS!". *Id.* ¶ 2. These tantalizing offers implied that new customers would receive $1,000 in withdrawable cash but, in reality, DraftKings never offered cash bonuses and to get the full $1,000, consumers had to make an initial single deposit of $5,000 and wager at least $25,000 on risky bets within a 90-day period. *Id.* ¶¶ 33–37.

As seen from the face of the advertisement, new consumers, like Plaintiff, could not have reasonably understood that to receive a "$1,000 Bonus", they would be obligated to satisfy additional, onerous requirements explained only in Promo Terms that were either entirely missing from the advertisements or merely referenced in unreadable fine print that was not hyperlinked. *Id*. ¶¶ 31–33. As a result of the $1,000 Bonus offer, Plaintiff Aminov, a New York citizen, signed up for DraftKings and made a $500 deposit but did not receive the $1,000 Bonus that he reasonably believed DraftKings promised. *Id*. ¶ 51.

Several years ago, many online sportsbooks truly did provide no-strings-attached free cash to lure new users, for example by providing straightforward deposit matches when new users signed up. *Id.* ¶ 22. After an initial wave of generous deposit bonuses contributed to steep losses for many operators, DraftKings and others stopped offering free cash in most states. *Id.* For online sportsbooks, incessant broadcast ads and enticing sign-up deals make sense because, on average, a new user will lose several thousand dollars to the sportsbook over a lifetime of gambling. *Id.* ¶ 20. Glitzy, eye-popping promotions like $1,000 sign-up bonuses are a sure-fire method to lure new bettors choosing among myriad online sportsbooks—all of whom generally offer the same technology and the same betting options. *Id.* ¶ 21.

In an online gambling marketplace saturated by sign-up promotions advertising a large dollar figure—some of which are truly no-strings-attached cash matches and some of which, like DraftKings, are not—consumer confusion reigns. *Id.* ¶ 23. Operators like DraftKings exploit that confusion by promising large sign-up bonuses but instead actually are providing complicated deals that require hefty investment of personal funds and onerous requirements to actually recoup their money. *Id.* In New York, the Attorney General warned of "deceptive" advertisements run by online sports betting companies ahead of the 2022 Super Bowl, explaining that consumers "have been

bombarded with misleading ads on social media and streaming sites that claim 'risk-free' bets and '$1,000 welcome offers,' which sound like free money, but often come with strings attached without consumers' awareness." *Id.* ¶ 49.

**B. DraftKings' False and Misleading Marketing and Deceptive Sign-Up Process Lures Reasonable Consumers to Sign Up for and Use DraftKings.**

DraftKings introduced its online sportsbook to the American public with a massive advertising blitz in 2018. Compl. ¶ 24. In New York, DraftKings' massive advertising campaign swiftly solidified it as an early leader in the online sports betting market. *Id.* ¶ 29. In its first three months operating in the state, DraftKings handled over $1.1 billion worth of bets and generated nearly $40 million in revenue. *Id.* DraftKings' omnipresent national TV and print and internet ads helped the sportsbook increase its market share dramatically. *Id.* ¶ 25. Those ads directed consumers to the DraftKings website or mobile app and promised $1,000 Deposit Bonus upon sign-up and other similar representations. *Id.* ¶ 26. DraftKings' marketing strategy was part of an intentional initiative to capitalize on the addictive nature of gambling, and the established susceptibility of online sports betters. *Id.* ¶ 27. In fact, DraftKings' preferred audience is new users and novice gamblers—those who are most likely to lose money. *Id.* ¶ 28. Its CEO admitted: "This is an entertainment activity. People who are doing this for profit are not the ones we want." *Id.*

In 2022 and for the majority of 2023, DraftKings promised a "$1,000 Deposit Bonus" to lure consumers into signing up for its sportsbook platform in these (or materially similar) terms: "JOIN DRAFTKINGS SPORTSBOOK GET A $1,000 DEPOSIT BONUS!" *Id.* ¶ 31. But a new customer of DraftKings was never going to receive "A $1,000 DEPOSIT BONUS" in exchange for signing up for the sportsbook platform, as the advertisements asserted. *Id.* ¶ 33. For a new customer to obtain the $1,000 Deposit Bonus, they would in fact have to satisfy three significant requirements. Specifically, to qualify for the $1,000 Deposit Bonus, the new user:

i)      Must immediately deposit at least $5,000 in cash with DraftKings; and

ii)      Must wager at least $25,000 with DraftKings within 90 days; and

iii)      do so on daily fantasy contests, sportsbook bets with -300 odds or longer, and/or casino products.

*Id*. DraftKings' advertisements did not fairly inform new users that the Deposit Bonus is calculated as 20% of up to $5,000 of the new user's *first* deposit. *Id.* ¶ 36. DraftKings failed to fairly disclose that consumers needed to *immediately* deposit $5,000 and then subsequently bet at least $25,000 in 90 days to qualify for the $1,000 Deposit Bonus. *Id.* ¶ 36. New DraftKings users like Plaintiff did not understand, and could not reasonably have been expected to understand, that to place bets for at least $25,000 over 90 days to qualify for the Bonus, they would have had to wager an average of more than $276 gambling on sports every day for three months. Were players only to gamble, for example, every third day over that period, their average daily wager would have had to be $828 to qualify for the Bonus. *Id.* ¶ 37.

In or around January 2022, Plaintiff Aminov recalls viewing this and similar advertisements online on DraftKings' website and mobile app prior to signing up for DraftKings and depositing money. *Id.* ¶ 32.

In its marketing about DraftKings and during its signup process within its mobile app and website, Defendant makes repeated promises that that DraftKings offers a $1,000 Deposit Bonus *Id.* ¶ 40. At no time were Plaintiff and the Class Members warned of the true financial risks of using the DraftKings service. *Id.* ¶ 41. In short, DraftKings misrepresents (and omits facts about) the true nature, benefits, and risks of signing up for DraftKings and depositing money on its platform. *Id.* ¶¶ 53, 54-58. Had Plaintiff and Class members been adequately informed of these risks, they would not have signed up for or used DraftKings for an initial sign-up bonus. *Id.*

### C. Plaintiff's Experience with DraftKings

Plaintiff signed up for DraftKings and deposited $500 based on DraftKings' promise that that he would receive a $1,000 Deposit Bonus. *Id.* ¶ 51. Plaintiff did not understand and was not fairly informed that to receive the $1,000 Deposit Bonus he would be required to deposit and wager large sums of money in a manner designed by DraftKings to induce repeated exposure to a known addictive product. *Id.* Based on DraftKings' promises, Plaintiff signed up for and deposited cash, but he did not receive the full bonus as promised. *Id.* ¶ 3. Plaintiff would never have signed up for a DraftKings account and made an initial deposit had he known the truth about the truth about the $1,000 Deposit Bonus. *Id.* ¶ 53. As a result of DraftKings' false promises, Plaintiff suffered monetary damages. *Id*. ¶¶ 8, 88, 98.

## ARGUMENT

### I. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim on which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### II. THE COURT SHOULD DISREGARD DEFENDANT'S DECLARATION AT THE MOTION TO DISMISS STAGE

"With some narrow exceptions, the motion-to-dismiss stage is not an appropriate time for a defendant to submit evidence in an effort to contradict a plaintiff's allegations." *Sportsinsurance.com, Inc. v. Hanover Ins. Co., Inc.*, No. 8:20-cv-0403 (LEK/DJS), 2021 WL 781286, at *2 (N.D.N.Y. Mar. 1, 2021). "A motion to dismiss challenges only the 'legal feasibility' of a complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016). "The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, ... , where both parties may conduct appropriate discovery and submit the additional supporting material contemplated[.]'" *Id.* at 559.

DraftKings attempts to contradict Plaintiff's allegations vis-à-vis a bareboned employee declaration from its Vice President of Product. *See* Declaration of Gary Wimbridge in Support of Defendant DraftKings Inc.'s Motion to Dismiss ("Wimbridge Decl."). Despite purporting to "have knowledge" of "how DraftKings presents its promotions" and the "user flow" of new customer promotions, the declaration fails to describe the DraftKings sign-up process and notably also lacks any description of a screen flow at all. *Id.* ¶ 2. Instead, in conclusory fashion it states that Plaintiff "would have been presented with the full terms" before he could have deposited funds. *Id.* ¶ 5. Mr. Wimbridge attaches an exhibit that purport to be screenshots of the deposit page.

*First*, this Court's consideration of DraftKings' extraneous information is improper on a motion to dismiss, and consideration of these materials would necessitate converting the motion to dismiss to one for summary judgment. Conversion at this stage in the litigation would be premature because Plaintiff has not yet been afforded a meaningful opportunity to conduct discovery and "submit additional supporting materials." *See, e.g., Interiano v. Arch Specialty Ins. Co.*, 723 F. Supp. 3d 147, 157 (E.D.N.Y. 2024) (refusing to permit conversion where the parties had not conducted discovery). *Second*, these materials raise factual questions regarding whether

and to what extend the statements in the screenshots were (i) actually "presented" to new customers depositing funds for the $1,000 Bonus; (ii) were displayed in the same form as depicted in the screenshots; (iii) were actually "seen" or "encountered" by Plaintiff; and (iv) if they were seen by Plaintiff, whether they affected Plaintiff's overall impression of the $1,000 Bonus within the entire context of all of DraftKings' communications concerning the offer. These factual questions must be answered through discovery—not by DraftKings' own independent assertions of fact. Indeed, Plaintiff cannot concede (absent verification through discovery) that the Wimbridge Declaration is sufficient to authenticate any of the purported screenshots as actually "representative" of the webpages that Mr. Wimbridge alleges Plaintiff would have encountered, or whether there may be any differences between the "representative" screenshots and the exact webpages that DraftKings displayed on the date Plaintiff made his deposit. *See In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1168-69 (S.D. Cal. 2010) (rejecting defendant's attempt to authenticate through employee declaration website screenshots offered in support of defendant's motion to dismiss noting plaintiff should have the opportunity to test the veracity of the exhibits).

But even if the Court were to consider it, nothing in the Wimbridge Declaration demonstrates that when Plaintiff signed up for and deposited funds, he was notified of the Promo Terms. Wimbridge describes DraftKings' mobile app and explains that "would have been presented with the full terms and conditions of the Promotion before he could have deposited funds or entered the Promotion." Wimbridge Decl. ¶ 5. Wimbridge conceals, however, that the Promo Terms were only found on multiple pages below, and Plaintiff, or any user, did not need to review the terms before depositing. Further, the Declaration is devoid of any assertion that users were required to agree to the Promo Terms. While Wimbridge shows that the Promo Terms were available at certain places within Defendant's mobile app and website, he conspicuously fails to

provide any evidence that Plaintiff was either shown or required to agree to those terms before depositing. *See, e.g.,* Wimbridge Decl. Thus, the Court should conclude that Plaintiff was not provided with sufficient notice of the Promo Terms and, therefore, Plaintiff's claims are not foreclosed by their existence.

## III.    THE COURT SHOULD DENY THE MOTION TO DISMISS BECAUSE THE COMPLAINT ADEQUATELY STATES CLAIMS FOR RELIEF.

The Court should reject DraftKings' arguments for dismissal under Rule 12(b)(6) because the claims for violation of the GBL, Intentional Misrepresentation, Fraudulent Inducement, and Quasi Contract/Unjust Enrichment/Restitution, are sufficiently pleaded and comply with Rule 9(b)'s pleading specificity requirements. Plaintiff sufficiently alleges he was misled by the eye-popping "$1,000 Deposit Bonus" advertisements and signed up for and deposited funds without knowledge of the "fine print" about the deceptive promotion. Courts in this district frequently apply Second Circuit precedent to hold, in similar circumstances, that a disclaimer or "fine print" buried in a website does not foreclose an action for deceptive advertising. Further, the Complaint provides sufficient detail concerning the "who, what, where, and how" of the alleged fraud to comply with Rule 9(b). The Court should therefore deny the Motion.

### A.    Plaintiff Sufficiently Alleges He Was Misled by DraftKings' Deceptive Marketing, Despite the "Fine Print" Buried in the Promo Terms.

Ignoring the Complaint's detailed allegations concerning the deceptive nature of its advertisements, DraftKings argues that its $1,000 Bonus promises were not false or misleading because DraftKings purportedly disclosed the Promo Terms, which disclose the true nature of the signup bonus, at some point before he deposited money and placed a wager on the mobile app (albeit *after* new customers would have already viewed DraftKings' $1,000 Bonus and decided to pursue the offer by creating a new account and depositing money). Mot. at 7–14.

As a preliminary matter, the Court should not consider the alleged disclosures at the Motion to Dismiss stage because this defense requires evidence that Plaintiff was provided with or assented to them. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235 (2d Cir. 2016) (reversing consideration of extrinsic evidence where document's accuracy, authenticity, and relevancy was disputed). As discussed above, Defendant fails to meet this burden.

Even if the Court were to consider the Promo Terms at this stage—despite the total lack of factual evidence that Plaintiff was ever provided with or assented to them—such fine print still provides no grounds for dismissal. Plaintiff sufficiently alleges that the $1,000 Bonus and advertisements promoting it have the capacity to mislead consumers because, *inter alia*, the advertisements clearly promise that new customers who joined DraftKings would receive a $1,000 reward by simply making a deposit. Compl. ¶ 4. Further, these customers—who by definition were likely to be novice gamblers exposed to a highly addictive product—could not reasonably be expected to know the actual costs and risks they would need to incur to receive the full $1,000.[1] *Id*. ¶ 5. Indeed, the Complaint expressly details that DraftKings designed its misleading promise of a $1,000 sign-up bonus to deceive new gambling customers into opening an account, depositing large sums of money, and repeatedly placing financially hefty wagers on DraftKings' sports betting platform. *Id*. ¶ 18. Further, Plaintiff alleges that the $1,000 Bonus was unfair and deceptive because DraftKings lured new customers to its platforms by advertising the bonus as a $1,000 reward that new customers earned by simply signing up on the DraftKings platform and making a deposit. *Id*. ¶ 26. But unbeknownst to these customers, DraftKings deceptively structured the

---

[1] Specifically, that the costs and risks required new customers to (i) make an initial $5,000 deposit; (ii) bet $25,000 within 90 days; and (iii) place all wagers on bets with -300 odds or longer to be eligible to claim the full $1,000. Compl ¶ 33.

bonus qualifications "so that it is nearly impossible to obtain [the $1,000 Bonus], and the new user is almost certain to lose money by chasing it." *Id.* ¶ 4.

Courts in this circuit repeatedly hold that determining whether a "reasonable consumer" would be misled by deceptive advertisements is "generally a question of fact not suited for resolution at the motion to dismiss stage," *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (collecting cases); *see also Dunham v. Sherwin-Williams Co.*, 636 F. Supp. 3d 308, 315 (N.D.N.Y. 2022). At this stage, to determine DraftKings' advertisements were not materially misleading as a matter of law is appropriate only if Plaintiff's claims are "patently implausible" or "unrealistic." *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 95–96 (S.D.N.Y. 2021) (quoting *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914, 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017)); *see also In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29, 2013) (observing that dismissal as a matter of law is appropriate where a plaintiff's allegations regarding deceptive labeling "border on fantasy").[2]

The "mere inclusion of an accurate disclaimer … does not necessarily cure other potentially misleading statements or representations set forth in a label or advertisement." *Cooper*, 553 F. Supp. 3d at 105 (quoting *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *16 (E.D.N.Y. Sept. 22, 2015)). Rather, the significance of a disclaimer depends upon factors such as the font size and placement of the disclaimer as well as the relative emphasis placed

---

[2] *See also Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 479–80 (S.D.N.Y. 2014) ("Although 'the presence of a disclaimer or other clarifying language *may* defeat a claim of deception,' the Court cannot hold as a matter of law that the product labels are not misleading to a reasonable consumer."); *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199 (MKB), 2016 WL 5372794, at *14 (E.D.N.Y. Sept. 26, 2016) ("The fact that the fine print on the back of the labeling could indicate to a consumer that other ingredients were not 'natural' does not render another conclusion so patently or objectively unreasonable so as to warrant dismissal as a matter of law . . . ."); *Ackerman v. Coca-Cola Co.*,No. CV-09-0395 (JG), 2010 WL 2925955, at *16 (E.D.N.Y. July 21, 2010) (reasonable consumer could be deceived that vitamin water contained just vitamins and water, even though nutritional label listed all ingredients)

on the disclaimer and the allegedly misleading statement. *See, e.g., Delgado v. Ocwen Loan Servicing, LLC*, No. 13–CV–4427, 2014 WL 4773991, at *9 (E.D.N.Y. Sept. 24, 2014) (holding that disclosures were "not conspicuous or prominent enough to necessarily cure" alleged misrepresentation and declining to grant dismissal on basis of reasonable consumer prong).

Here, DraftKings' website prominently displayed the text—in all capital letters and eye-catching green font: Join and receive a "$1,000 DEPOSIT BONUS!" Compl. ¶ 31. Conversely, in tiny text below the large advertisement it stated, "View Terms," but it was not underlined and not in a distinguishing color. *Id*. Further, the screenshots attached to the Wimbridge Declaration demonstrate a cluttered payment screen that includes a prominent orange banner ad stating "Limited Time Offer!", with multiple tiles to deposit various amounts of money and numerous logos with different payment methods; only after scrolling through multiple pages can the Promo Terms be found buried at the bottom in non-discerning typeface. *See* ECF 6-1. A reasonable factfinder could find that the disclaimer was "not bold, capitalized, or conspicuous in light of the whole" advertisement, and was "generally obscure[d]" by other "distracting" elements on DraftKings website and mobile app. *Nicosia*, 834 F.3d at 237. As the Second Circuit has emphasized, a consumer's "duty to read" terms properly "called to [their] attention" does not imply a "duty to ferret out contract provisions ... contained in inconspicuous hyperlinks." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 295(2d Cir. 2019) (citation omitted).

For example, where a prominent label on a product was plausibly alleged to have deceived consumers, the Second Circuit held that a reasonable consumer is not "expected to look beyond misleading representations" in one part of an advertisement "to discover the truth ... in small print" online. *Mantikas v. Kellogg Co*., 910 F.3d 633, 637 (2d Cir. 2018) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). This is precisely what DraftKings expected

Plaintiff was required to do here. Similarly, as in *Wilson v. Huuuge, Inc.*, consumers like Plaintiff were not required to scroll past the Promo Terms to make a deposit. 944 F.3d 1212, 1221 (9th Cir. 2019) (holding courts will not enforce agreements where, like here, the terms are "buried at the bottom of the page … especially when such scrolling is not required to use the site.") (citations omitted). Lastly, putting aside that DraftKings failed to clearly and conspicuously disclose the Promo Terms, there is no mechanism—such as a checkbox—to verify that a customer has *actually* read the terms or unambiguously accepts the terms as a condition of depositing funds. *See, e.g., Nicosia*, 834 F.3d at 238 ("clickwrap agreements that display terms in a scrollbox and require users to click an icon…are certainly the easiest method of ensuring that terms are agreed to").

Applying this law, courts in this Circuit frequently deny motions to dismiss, despite defendant's reliance on "fine-print" disclaimers that disclose the truth about allegedly deceptive advertising, because whether a reasonable consumer was misled is a question more appropriate at summary judgment, not at the motion to dismiss stage where the only question is "whether the complaint plausibly alleges that a reasonable consumer would ascribe the meaning that plaintiffs allege they ascribed to it. *Fishon v. Peloton Interactive, Inc.*, No. 19-CV-11711 (LJL), 2020 WL 6564755, at *4, 7 (S.D.N.Y. Nov. 9, 2020) ("[T]erms and conditions cannot as a matter of law overcome deceptive marketing practices."); *see also, e.g., Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (2012) (finding complaint stated a claim despite fine-print disclaimer that wine is sold "as is" where defendant prominently advertised that the wine was rare and valuable: "disclaimers ... do not establish a defense as a matter of law" and must be viewed in context (quoting *Goshen v. Mutual Life Ins. Co. of N.Y.*, 774 N.E.2d at 1190 (2002)).

By contrast, the cases DraftKings relies on to argue Plaintiff was on inquiry notice are procedurally and factually distinguishable because, in those cases, courts analyzing motions to

compel arbitration found consumers unambiguously manifested assent to terms through affirmative conduct that a reasonable person would understand to constitute assent. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) (finding under California law that plaintiff unambiguously manifested assent to the terms by clicking the button marked "Register" for an account given the text stating that "[b]y creating an Uber account," the customer "agree[s]" to the terms and based on the temporal and spatial coupling of the "Terms of Service" hyperlink with the registration button); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (finding unambiguously manifested assent where consumer navigated to provider's checkout "widget" from merchant's website, notice of terms was hyperlinked in statement, "I agree to the payment terms" and statement was placed directly above "Confirm and continue" button, widget's interface was uncluttered and did not need to "scroll beyond what is immediately visible to find the terms"). Here, by contrast, DraftKings fails to show Plaintiff ever assented to the Promo Terms, even in its self-serving declaration that ought not be considered at this stage.

DraftKings reliance on *Derbaremdiker v. Applebee's Int'l, Inc.,* to argue that disclosures in the Terms of Use preclude a finding of the "materially misleading" element under Section 349 is not persuasive. There, plaintiffs and defendants both expressly agreed at oral argument that the exhibits could be considered on a motion to dismiss (they included a sweepstakes' official rules located on a website that was expressly typed out and referenced on plaintiff's receipt, which the plaintiff himself submitted to the court, and the rules did not contradict the statements on plaintiff's receipt). No. 12-cv-01058 (KAM), 2012 WL 4482057, at *1-3 (E.D.N.Y. Sept. 26, 2021), *aff'd*, 519 F. App'x 77, 78 (2d. Cir. 2013).

Ultimately, the extent and content of any disclaimer cannot be resolved on the pleadings, making it premature to decide whether and "when the allegedly deceptive practice was disclosed."

*Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 501 (2d Cir. 2020); *Sherwin-Williams Co.*, 636 F. Supp. 3d at 315. Indeed, in a similar case concerning DraftKings' misleading "$1,000 Bonus", plaintiffs alleged the $1,000 Bonus promotion is deceptive and violates Massachusetts' consumer protection law, and the court denied a similar motion to dismiss. *See* ECF 7-1 (*Scanlon v. DraftKings, Inc.*, No. 2484CV01099-BLS2 (Suffolk Cnty. Super. Ct.)). The court found that whether a reasonable consumer would be misled based on "the overall deceptiveness of the mobile app and website, sign up process, and terms and conditions cannot be resolved without additional information. The questions of deception and causation are ones that must be developed in discovery, as the 'analysis of what constitutes an unfair or deceptive practice requires a case-by-case analysis... and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." *Id*. at 8-9 (citations omitted). The same is true here.

Accepting Plaintiff's factual allegations as true and drawing all reasonable inferences in their favor, the Court should conclude that the existence of the Promo Terms somewhere within Defendant's website or app does not, as a matter of law, foreclose Plaintiff's causes of action.

## B. Plaintiff Properly Pleads a Cognizable Injury under the GBL Sections 349 and 350

DraftKings' argument that Plaintiffs' GBL claims cannot proceed because he "failed to plead any injury he allegedly suffered by virtue of creating a DraftKings account" ignores Plaintiff's well-pled allegations regarding the scope of his injury. The Complaint adequately alleges that Plaintiff suffered cognizable economic damages beyond the deceptive nature of DraftKings' advertising itself. Plaintiff alleges that, as a result of DraftKings' deceptive advertising: (1) misled Plaintiff into belieiving that he would obtain a $1,000 signup bonus if he opened an account and deposited money with Draft Kings, Compl. ¶¶ 6, 41, 53; (2) Plaintiff actually opened an account and deposited money with DraftKings, but did not receive the $1,000, *id*. ¶ 54. Additionally, Plaintiff incurred damages in the amount of his initial $500 deposit. *Id*. As

a result, Plaintiff actually suffered economic damages, including DraftKings' refusal to pay the $1,000 Bonus, and Plaintiffs now seek the return of his initial deposit or the $1,000 Bonus that DraftKings promised as economic damages. *Id*. ¶ 54. These allegations sufficiently plead injury. *See Pichardo v. Only What You Need, Inc.*, No. 20-CV-493 (VEC), 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020) (holding allegation that plaintiff would not have purchased product had they known the true facts sufficient to plead injury); *Gay v. Garnet Health*, No. 23-CV-06950 (NSR), 2024 WL 4203263, at *7 (S.D.N.Y. Sept. 16, 2024) (same). Based on DraftKings' deceptive advertising, Plaintiff signed up for DraftKings, deposited monies, and did not receive "the full value" of the deposit bonus and thus, Plaintiff has alleged a cognizable injurie in losing the benefit of the bargain. *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (finding injury may also be in the form of a deprival of contracted-for services).

Injury, under the GBL, has also been found where a plaintiff is given less product than promised and thus, failed to receive the benefit of his bargain and overpaid. *See Daniel v. Mondelez Intl., Inc.*, 287 F. Supp. 3d 177, 197–98 (E.D.N.Y. 2018) (explaining that GBL injury may be established by an allegation that a plaintiff overpaid). Here, Plaintiff alleged he received less of the "deposit bonus" than promised and thus, he was deprived of the benefit of his bargain with DraftKings.

In *Scanlon*, the plaintiffs alleged that they opened accounts with DraftKings and deposited money, in reliance on the signup bonus promotion. And that they would not have paid DraftKings at all, but for the false and misleading promotion. *See* ECF 7-1 at 6. The *Scanlon* court found substantially similar allegations of injury stemming from a $1,000 Bonus promotion "plausibly suggest that [plaintiffs] were harmed because they brought into a service worth less than they believed based on the promotion." *Id.* Similarly, here, Plaintiff was harmed by signing up and

depositing funds with DraftKings based off the promise of a deposit bonus. Plaintiff incurred economic damages by paying for a service that was less than he reasonably expected (i.e. only receiving $100 deposit bonus rather than the $1,000 he was promised). Thus, Plaintiff properly pleads economic injury under the GBL.

### C. Plaintiff Satisfies the GBL'S "Territoriality" Requirement

In a final attempt to have Plaintiffs' well-pleaded GBL claim dismissed, DraftKings asserts that Plaintiff has not satisfied the "territorial" element of Sections 349 and 350. Mot. at 17. However, as the Second Circuit recently explained, where a New York citizen enters an online transaction then it satisfied the requirement that "the transaction in which the consumer is deceived must occur in New York." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023). Further, Plaintiff's complaint belies this argument because he explicitly alleges that DraftKings' deceptive advertising was "disseminated through New York state." Compl. at ¶ 69. Drawing all reasonable inferences in Plaintiff's favor, the Court should find that Plaintiff satisfies the territorial element of the GBL. *See, e.g., McNaughton,* 67 F.4th at 99.

### D. Plaintiff States a Claim For Unjust Enrichment

Defendant argues that Plaintiff's claim for unjust enrichment fails because it is duplicative of Plaintiff's other claims. *See* MTD at 23–24. Plaintiff's allegations are more than adequate to state a claim for unjust enrichment and are not duplicative because Plaintiff is allowed to plead in the alternative. Fed. R. Civ. P. 8(d)(2).

A plaintiff may succeed on a claim for unjust enrichment by showing "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Scholder v. Sioux Honey Ass'n Coop.*, No. CV 16-5369 (GRB), 2022 WL 125742, at *6 (E.D.N.Y. Jan. 13, 2022) (citing *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009)). Plaintiff alleges several misleading and deceptive representations about the promotional offers

advertised by Defendant. *See* Compl. ¶¶ 24–42; 51–54; 101–07. Specifically, Plaintiff alleges that Defendant benefited from inducing Plaintiff to pay money relying on these representations. *See id.* Plaintiff's allegations demonstrate a clear, causal link between Defendant's wrongful conduct at the expense of Plaintiff and Defendant's resulting unjust enrichment warranting equitable relief. *See* Compl. ¶¶ 24–42; 51–54; 101-07. As a result, Plaintiff alleges that it is inequitable and unjust for Defendant to retain any profit, benefit, or compensation conferred upon it by its deceptive and misleading representations. *See* Compl. ¶¶ 101-07 Plaintiff accordingly seeks "restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct . . ." *See* Compl. ¶ 107.

The cases Defendant cites are unpersuasive. Courts in this circuit have interpreted rule 8(d) of the Federal Rules of Civil Procedure to explicitly allow Plaintiff to plead unjust enrichment in the alternative to statutory claims. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also Scholder*, 2022 WL 125742, at *6 (holding plaintiff's allegations to state an unjust enrichment claim sufficient because "Rule 8(d)(3) of the Federal Rules of Civil Procedure permits a party to state 'as many separate claims or defenses as it has, regardless of consistency.'") (internal citations omitted); *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 465-66 (S.D.N.Y. 2018) (". . . under Federal Rule of Civil Procedure 8(d), a plaintiff can plead in the alternative such that it can challenge the validity of the contract *and* allege unjust enrichment."); *See St. John's Univ.*, 757 F. Supp. 2d at 183 (denying Defendants' motions to dismiss the unjust enrichment claims as duplicative as "the Federal Rules of Civil Procedure explicitly permit Plaintiff to assert claims in the alternative.")

Furthermore, while it may be the case that an "unjust enrichment [claim] is… viable only in the absence of an enforceable agreement between the parties governing the subject matter of the dispute," *St. John's University, New York v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010), "it is not always apparent at the pleading stage whether a contract both is valid and governs the subject matter." *Hallmark Aviation Ltd. V. AWAS Aviation Servs., Inc.*, No. 12-cv-7688-JFK, 2013 WL 1809721, at *13 (S.D.N.Y. Apr. 30, 2013). As a result, "courts routinely reject arguments to dismiss unjust enrichment claims as premature" at the pleading stage. *Hallmark Aviation Ltd.*, 2013 WL 1809721, at *5 (citations omitted); *see also St. John's Univ.*, 757 F. Supp. 2d at 183 (denying motion to dismiss unjust enrichment claim based on similar argument) ("At the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims."); *Scholder*, 2022 WL 125742, at *6 ("[A]lthough the unjust enrichment claim may ultimately be deemed duplicative of [the] plaintiff's other theories of recovery, at this stage of the proceedings, [the] allegations are sufficient."); *McTyere v. Apple, Inc.*, 663 F. Supp. 3d 247, 259 (W.D.N.Y. 2023) (denying motion to dismiss plaintiffs' GBL § 349 claims and unjust enrichment claim). These turn on issues of fact "that cannot be determined on the motion to dismiss." *Scholder*, 2022 WL 125742, at *6. Accordingly, Plaintiff sufficiently states a claim for unjust enrichment.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request the Court enter an order denying the Motion based on that the Complaint adequately state causes of action. Should the Court grant any part of Defendant's motion, Plaintiff respectfully requests leave to amend. *See Kandel v. Dr. Dennis Gross Skincare, LLC*, 721 F. Supp. 3d 291, 309–10 (S.D.N.Y. 2024) (granting leave to amend).

Dated:  March 7, 2025

Respectfully Submitted,

*/s/ Andrew J. Shamis*
Andrew J. Shamis (Bar No. 5195185)
Edwin E. Elliott (*pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Jeffrey D. Kaliel*
Sophia Goren Gold*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielgold.com

Adam A. Schwartzbaum*
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
adam@edelsberglaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff and the Proposed
Classes*